UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| **LAURIE ELIZABETH FERGUSON** | **CIV. ACTION NO. 3:21-02262** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **KILOLO KIJAKAZI, ACTING COMMISSIONER, U.S. SOCIAL SECURITY ADMINISTRATION** | **MAG. JUDGE KAYLA D. MCCLUSKY** |

**REPORT AND RECOMMENDATION**

Before the court is Plaintiff's petition for review of the Commissioner's denial of social security disability benefits. The district court referred the matter to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the reasons assigned below, it is recommended that the decision of the Commissioner be **AFFIRMED**, and this matter **DISMISSED** with prejudice.

**Background & Procedural History**

Laurie Ferguson protectively filed the instant application for Title XVI supplemental security income payments on January 11, 2019. (Tr. 15, 177-182).[1] Ferguson, who was 53 years old at the time of the administrative hearing, asserted a disability onset date of April 14, 2018, because of heart attacks and chronic seizures. (Tr. 34, 60, 231). The state agency denied the claim initially on March 26, 2019, and upon reconsideration on September 4, 2019. (Tr. 68-94, 105-108, 113-116). Thereafter, Ferguson requested and received a November 12, 2020 hearing before an Administrative Law Judge ("ALJ"). (Tr. 28-56). In a March 1, 2021 written decision, the ALJ determined that Ferguson was not disabled under the Social Security Act,

---

[1] Ferguson filed prior applications in April 2016, which were denied at the administrative hearing level on April 13, 2018, and apparently not further appealed. *See* Tr. 60, 213-214.

finding at step five of the sequential evaluation process that she was able to make an adjustment to work that exists in significant numbers in the national economy. (Tr. 12-22). Ferguson sought review of the adverse decision before the Appeals Council. On May 26, 2021, however, the Appeals Council denied Ferguson's request for review; thus, the ALJ's decision became the final decision of the Commissioner. (Tr. 1-3).

On July 30, 2021, Ferguson filed the instant complaint for judicial review of the Commissioner's final decision. Following submission of the administrative transcript and supporting memoranda, the matter is now before the court.

## Standard of Review

This court's standard of review is (1) whether the final decision is supported by substantial evidence, and (2) whether the Commissioner applied the proper legal standards to evaluate the evidence. *Keel v. Saul*, 986 F.3d 551, 555 (5th Cir. 2021) (citation omitted). The Supreme Court has emphasized that

> [t]he phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Biestek v. Berryhill*, ___ U.S. ___, 139 S.Ct. 1148, 1154 (2019) (internal citations omitted). The reviewing court may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

Upon finding substantial evidence, the court may only review whether the Commissioner

has applied proper legal standards and conducted the proceedings consistently with the statute and regulations. *Carter v. Heckler*, 712 F.2d 137, 140 (5th Cir. 1983). In other words, where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed – *unless* the Commissioner applied an incorrect legal standard that materially influenced the decision. *See* 42 U.S.C. § 405; *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000); *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).

### **Determination of Disability**

Pursuant to the Social Security Act ("SSA"), individuals who contribute to the program throughout their lives are entitled to payment of insurance benefits if they suffer from a physical or mental disability. *See* 42 U.S.C. § 423(a)(1)(D). The SSA defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . ." 42 U.S.C. § 423(d)(1)(A). A disability may be based on the combined effect of multiple impairments which, if considered individually, would not be of the requisite severity under the SSA. *See* 20 C.F.R. § 404.1520(a)(4)(ii). Based on a claimant's age, education, and work experience, the SSA utilizes a broad definition of substantial gainful employment that is not restricted by a claimant's previous form of work or the availability of other acceptable forms of work. *See* 42 U.S.C. § 423(d)(2)(A).

The Commissioner of the Social Security Administration has established a five-step sequential evaluation process that the agency uses to determine whether a claimant is disabled under the SSA. *See* 20 C.F.R. §§ 404.1520, 416.920. The steps are as follows,

(1) An individual who is performing substantial gainful activity will not be found disabled regardless of medical findings.

(2) An individual will be found not disabled if he or she does not have a "severe impairment," or a combination of impairments that is severe, and of the requisite duration.

(3) An individual whose impairment(s) meets or equals a listed impairment in [20 C.F.R. pt. 404, subpt. P, app. 1], and meets the duration requirement, will be considered disabled without the consideration of vocational factors.

Before proceeding to step four, the Commissioner assesses the individual's residual functional capacity, which is used at both step four and step five to evaluate the claim.

(4) If an individual's residual functional capacity is such that he or she can still perform past relevant work, then a finding of "not disabled" will be made.

(5) If an individual is unable to perform past relevant work, then other factors including age, education, past work experience, and residual functional capacity must be considered to determine whether the individual can make an adjustment to other work in the economy. If the individual can make such an adjustment, then he or she will be found not disabled. If the individual is unable to adjust to other work, then he or she will be found disabled.

See *Boyd v. Apfel*, 239 F.3d 698, 704 -705 (5th Cir. 2001); 20 C.F.R. §§ 404.1520, 416.920.

When a finding of "disabled" or "not disabled" may be made at any step, a decision will be rendered at that point without proceeding to the remaining steps. 20 C.F.R. §§ 404.1520, 416.920; *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990). "The claimant bears the burden of proof on the first four steps, but the Commissioner bears the burden on the fifth step." *Salmond v. Berryhill*, 892 F.3d 812, 817 (5th Cir. 2018) (citation omitted).

## The ALJ's Findings

### I. Steps One, Two, and Three

The ALJ determined at step one of the sequential evaluation process that the claimant did not engage in substantial gainful activity during the relevant period. (Tr. 17). At step two, she

found that the claimant suffered severe impairments of seizure disorder and shoulder disorder. (Tr. 17-18).[2] She concluded, however, that the impairments were not severe enough to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4, at step three of the process. *Id*.

## II.     Residual Functional Capacity

The ALJ next determined that the claimant retained the residual functional capacity ("RFC") to perform light work,[3] "except indoor/climate controlled work environment; must avoid dangerous moving machinery and unprotected heights; and will miss no more than 1 day per month."  (Tr. 18-20).

## III.    Steps Four and Five

With the assistance of a vocational expert, the ALJ concluded at step four of the sequential evaluation process that the claimant was unable to return to past relevant work.  (Tr. 20-21).   Accordingly, she proceeded to step five.   At this step, the ALJ determined that the

---

[2] The ALJ further determined that the claimant's obesity, high cholesterol, and thyroid disorder did not cause more than minimal limitation in the claimant's vocational functioning, and, thus, were not severe.  *Id*.  In addition, although the claimant alleged symptoms from two infarcts, the ALJ found no supporting medical evidence, and, thus, concluded that it was not a medically determinable impairment.

[3]   Light work entails:
> . . . lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(b), 416.967(b).

claimant was an individual closely approaching advanced age, with at least a high school education. *Id*. Transferability of skills was not material to the determination of disability. *Id*.

The ALJ next observed that, given the claimant's vocational factors, and if she had an RFC that did not include any non-exertional limitations, then the Medical-Vocational Guidelines would direct a finding of not disabled. 20 C.F.R. §§ 404.1569, 416.969; Rule 202.14, Table 2, Appendix 2, Subpart P, Regulations No. 4; Tr. 20-21. However, because the claimant's RFC *did* include non-exertional limitations, the ALJ consulted the VE to determine whether, and to what extent the additional limitations eroded the occupational base for work. *Id*. In response, the VE identified the representative jobs of **companion**, *Dictionary of Occupational Titles* ("DOT") Code # 309.677-010; **raw shellfish preparer**, DOT # 311.674-014; and **silver wrapper**, DOT # 318.687-018, that were consistent with the ALJ's RFC and the claimant's vocational profile. (Tr. 21, 51-52).[4]

### Non-Exhaustive Chronology of Medical Evidence

On May 15, 2017, Ferguson saw Mark Napoli, M.D, for convulsive disorder, hyperlipidemia, hypothyroidism, and vasovagal syncope. (Tr. 326-331). She had no musculoskeletal symptoms. *Id.*

Ferguson had an office visit with Gyanendra Kumar Sharma, M.D., on May 25, 2017. (Tr. 308-309). Dr. Sharma noted that Ferguson had a stable seizure disorder, with the last episode in March 2016. (Tr. 308-309).

---

[4] The VE responded that for the companion, raw shellfish preparer, and silver wrapper jobs, there were 128,900, 20,900, and 107,400 positions available nationwide, respectively. (Tr. 51-52, *but see* Tr. 55). This incidence of work constitutes a significant number (and range) of jobs in the "national economy." 42 U.S.C. § 423(d)(2)(A); *Johnson v. Chater*, 108 F.3d 178, 181 (8th Cir. 1997) (200 jobs at state level and 10,000 nationally, constitute a significant number).

Ferguson returned to Dr. Sharma on April 19, 2018. (Tr. 305-306). The progress notes reflect that she had had one seizure, with the most recent episode lasting less than 30 seconds. *Id.* All other systems were negative. *Id.* She had a normal range of motion. *Id.*

Ferguson saw Dr. Napoli on July 24, 2018, for convulsive disorder, syncope, hyperlipidemia, and hypothyroidism. (Tr. 332-337). She had no symptoms and normal movement of extremities. *Id.*

On August 8, 2018, Ferguson was seen by John Tilmon, MPA-C, where she reported left arm irregularities, with symptoms that began about one year earlier. (Tr. 662-665). However, she had no pain with her symptoms. *Id.* Upon examination, Ferguson exhibited a normal range of motion, no joint crepitus, and no pain with joint motion. *Id.* Tilmon educated her on lowering her BMI. *Id.*

On October 2, 2018, Ferguson returned to Dr. Sharma for her seizure disorder, which was controlled with medication. (Tr. 604-606). She had no complaints and had not had a seizure for the past year. *Id.*

On November 19, 2018, non-examining agency physician, James Crout, M.D., reviewed the administrative record and issued a physical residual functional capacity assessment finding that Ferguson retained the capacity for work at all exertional levels, with the need to avoid all exposure to hazardous machinery and heights because of her seizure disorder. (Tr. 64-65).

On December 9, 2018, Ferguson went to the emergency department, where she complained of falling and hitting her head. (Tr. 601-603). She stated that she slipped in the kitchen and hit her head on the tile floor. *Id.* She was diagnosed with a head injury and discharged. *Id.*

On December 21, 2018, Ferguson saw Layne Johnson, PA, for follow-up for her head trauma. (Tr. 673-676). She reported mild pain at the site of impact, but otherwise had no headaches, nausea, tinnitus, weakness, or changes in vision. *Id.* She had normal range of motion in her extremities, with no pain. *Id.*

On February 25, 2019, Ferguson saw John Tilmon, MPA-C, for her complaints of moderate, intermittent, left shoulder pain. (Tr. 679-682). Aggravating factors included overhead lifting and getting dressed. *Id.* She also had left hand tingling. *Id.* Upon examination, Ferguson exhibited a normal range of motion, with shoulder tenderness, but within normal limits. *Id.* Tilmon diagnosed shoulder strain and issued a referral for physical therapy. *Id.*, 719-720.

On February 27, 2019, Ferguson had an initial evaluation with Anjelique Liles, PT. (Tr. 736-737). Ferguson described difficulty with both shoulders that made her daily activities difficult. *Id.* Her prior functional status was with no pain or limitation. *Id.* Ferguson reported that her left shoulder pain started initially when she had reached out for something, and then, a few days later, her right shoulder began hurting as well. *Id.* She described her pain as 3/10 at rest, and 6/10 with activity. *Id.* Exacerbating factors included reaching and household chores. *Id.*

On March 25, 2019, non-examining agency physician, Joseph Michalik, M.D., reviewed the record, and issued a physical residual functional capacity assessment for work at all exertional levels, with the need to avoid all exposure to hazardous machinery and heights because of syncope and seizures. (Tr. 75-76).

8

On June 13, 2019, Ferguson returned to Dr. Sharma for her seizure disorder, et al. (Tr. 728-730). She had no complaints. *Id*.

On June 20, 2019, Ferguson was discharged from physical therapy with goals met and maximal level reached. (Tr. 753-754).

On August 6, 2019, Ferguson returned to Dr. Napoli for her annual follow-up. (Tr. 757-762). She had no musculoskeletal symptoms or joint pain. *Id.* Dr. Napoli instructed her to limit strenuous exertion because of her seizure disorder. *Id.* She was to return in one year. *Id.*

On September 3, 2019, non-examining agency physician, Hollis Rogers, M.D., reviewed the record, and opined that Ferguson retained the residual functional capacity for work at all exertional levels, with the need to avoid even moderate exposure to hazardous machinery and heights because of syncope and seizures. (Tr. 94-96).

On September 17, 2019, Ferguson saw Layne Johnson, PA, for complaints of bilateral shoulder pain for the past three days. (Tr. 827-830). However, she stated that her symptoms had been going on for a while. *Id.* She reported constant, moderate pain in her bilateral shoulders, plus increased pain with movement of her shoulders, especially with reaching forward or backward. *Id.* Ferguson explained that therapy had improved her symptoms, but it had returned in both shoulders. *Id.* Upon examination, she had decreased range of motion in her shoulders. *Id.* Johnson diagnosed muscle strain. *Id.*

Shoulder x-rays taken on September 18, 2019, showed no radiographic abnormality. (Tr. 831-833).

On October 9, 2019, Ferguson saw Jill Reneau, PA-C, for sore throat, etc., where she denied joint swelling or limitation of motion. (Tr. 835-838). Upon examination, she had normal range of motion, with no pain on motion. *Id.*

On November 12, 2019, Ferguson returned to Layne Johnson, PA, for follow-up after a fall. (Tr. 843-845). She had been doing well since the fall. *Id.* She did not know whether the fall was attributable to a seizure or not. *Id.* She exhibited no pain on motion in her upper extremities. *Id.*

On February 5, 2020, Ferguson went to the emergency department after she tried to sit down but missed the chair and hit her head on the floor. (Tr. 798-805). She reported dizziness afterwards, but no headache and no loss of consciousness. *Id.* Her bilateral extremity strength remained equal and intact. *Id.*

Ferguson saw Charlotte Shaw, PA, on February 20, 2020, for sore throat, et al. (Tr. 846-849). She denied joint swelling and limitation of motion. *Id.*

On February 24, 2020, Ferguson saw Layne Johnson, PA, for swollen lymph nodes. (Tr. 850-852). At that time, she again denied joint swelling or limitation of motion. *Id.*

On March 16, 2020, Ferguson went to the emergency department after she tripped and fell in the kitchen while putting up breakfast dishes. (Tr. 790-797). She had hit her head on the concrete. *Id.* Nonetheless, she had no neck pain, no back pain, no loss of consciousness, and no tingling. *Id.* She also had normal range of motion in her joints. *Id.*

On March 23, 2020, Ferguson was treated by John Tilmon, MPA-C, to remove staples from her head after a fall in the kitchen. (Tr. 853-856).

On March 30, 2020, Ferguson returned to the emergency room after another fall. (Tr. 778-779). She did not know whether she had suffered a seizure. *Id.*

Ferguson returned to Dr. Sharma on April 9, 2020, for her seizure disorder, et al. (Tr. 767-773). She was feeling fine at that time but reported falls on March 9 and March 30. *Id.* Her extremities were normal. *Id.* Sharma discussed increasing her Depakote, and diagnosed hyperlipidemia, hypothyroidism, and seizure disorder. *Id.*

On May 28, 2020, Ferguson returned to Layne Johnson for a slip and fall. (Tr. 806-809). She was not in pain but had a sore head. *Id.* Her musculoskeletal system was within normal limits. *Id.* She had normal range of motion in all extremities, with no pain on motion. *Id.*

On October 13, 2020, Ferguson saw Dr. Sharma for hypertension, hypothyroidism, seizure disorder, and obesity. (Tr. 903-906). She reported that she felt fine. *Id.* Sharma discussed diet and exercise for weight loss. *Id.* Her extremities were normal, atraumatic, with no cyanosis or edema. *Id*.

## Analysis

In her decision, the ALJ reviewed the available evidence, including the hearing testimony, seizure questionnaires, self-completed function reports, treatment records, and the impressions of the non-examining state agency medical consultants.[5] (Tr. 18-20). In deriving Ferguson's RFC, the ALJ found that the opinions of the state agency medical consultants were "unpersuasive because later medical records establish shoulder impairment that would limit her

---

[5] The opinions of state agency medical and psychological consultants are now called, "prior administrative finding[s]." 20 C.F.R. § 416.913(a)(5).

ability to lift/carry." (Tr. 19) (record citation omitted).

Ferguson advanced one assignment of error in her brief: the ALJ's RFC determination is not supported by substantial evidence because she had no medical guidance, and, therefore, further record development was required. Specifically, when the ALJ determined that the opinions of the state agency physicians were "unpersuasive," she was left with no medical guidance upon which to base her RFC determination and, therefore, essentially conjured the RFC on her own.

To be sure, when no medical provider has issued an opinion or medical source opinion regarding the effects of a claimant's impairments, this omission frequently requires reversal and remand. *See, e.g., Coleman v. Astrue,* Civ. Action No. 09-0759, 2010 WL 3257621 (W.D. La. July 21, 2010). However, the absence of a medical source statement, "does not, in itself, make the record incomplete." *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995). In such a situation, the court's inquiry properly "focuses upon whether the decision of the ALJ is supported by substantial evidence in the existing record." *Id.*[6]

Upon review, the undersigned finds that this case presents one of the instances where the record supplies the requisite substantial evidence to support the ALJ's RFC. First, all three agency physicians opined that Ferguson retained the capacity for work at all exertional levels.

---

[6] The Fifth Circuit recently stated that the ALJ is not required to adopt a specific physician's statement, and that it was the responsibility of the ALJ to determine the claimant's RFC. *Miller v. Kijakazi*, No. 22-60541, 2023 WL 234773, at *4 (5th Cir. Jan. 18, 2023) (unpubl.). The inquiry, instead, is whether the ALJ's determination is based on substantial evidence. *Id.*; *see also Webster v. Kijakazi*, 19 F.4th 715, 719 (5th Cir. 2021) (although the ALJ neither adopted the state agency report verbatim nor accepted the testimony of the treating physician, it cannot be said that his decision was not based on substantial evidence or that he improperly applied the relevant legal standards).

While the ALJ ultimately decided to reduce Ferguson's RFC to work at the light exertional level based on her seizure and shoulder disorders, the agency medical opinions or "prior administrative findings" still provide a baseline for the ALJ's determination because, by opining that she was capable of work at all exertional levels, they also effectively opined that she was capable of light work. *See* 20 C.F.R. § 416.967(e) ("[i]f someone can do very heavy work, we determine that [they] can also do heavy, medium, light, and sedentary work.").

Even still, Ferguson argues that the ALJ assessed the effects of her shoulder impairment without the benefit of medical guidance. As it turns out, however, one of the medical consultants, Dr. Rogers, *did* consider some of the treatment records relating to Ferguson's shoulder impairment, but nonetheless opted not to endorse a shoulder impairment and did not assign any postural limitations. *See* Tr. 93-97. Moreover, these findings (by the ALJ and Dr. Rogers) are consistent with Ferguson's own representations regarding the effects of her shoulder impairment.

First, the medical treatment records reveal no complaints by Ferguson about her shoulders for more than one year after September 2019.[7] To the contrary, Ferguson's various medical encounters consistently indicate that she exhibited normal range of motion, with no pain. Second, at the November 12, 2020 hearing, after having reviewed her seizures and their effects, Ferguson was unable to recall any other condition that would interfere with her ability to work when directly queried by her representative. (Tr. 49-50). Moreover, Ferguson's impairments did not prevent her from sometimes working at the theater and serving as an usher. (Tr. 40).

Nevertheless, Ferguson further argues that the ALJ should have recontacted her treating physicians to obtain a medical source statement or sent her for a consultative examination.

---

[7] Even Ferguson's provider characterized her shoulders issue as but a "muscle strain."

13

Under the current regulations, however, the Commissioner will not recontact a medical source or otherwise purchase a consultative examination if all of the medical opinions of record are consistent and there is sufficient evidence for the Commissioner to render a decision. *See* 20 C.F.R. §§ 416.920b and 416.919a. Indeed, the ALJ need not order a consultative examination at government expense "unless the record establishes that such an examination is necessary to enable the administrative law judge to make the disability decision." *Pierre v. Sullivan*, 884 F.2d 799, 802 (5th Cir. 1989) (quoting *Turner v. Califano*, 563 F.2d 669, 671 (5th Cir. 1977)). Here, there is no indication that the evidence was so insufficient or inconsistent that the ALJ was unable to render a decision. Even if it were, under the regulations, the ALJ no longer is *required* to re-contact the medical source or to obtain a consultative examination.

Finally, to obtain reversal due to the ALJ's failure to adequately develop the record, the claimant also must demonstrate resulting prejudice. *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996). "To establish prejudice, a claimant must show that [s]he could and would have adduced evidence that might have altered the result." *Id.* (Internal quotes omitted). Ferguson has not made the requisite showing here.

In sum, the undersigned finds that Ferguson's sole assignment of error does not warrant reversal, and that the ALJ's RFC is supported by substantial evidence. Ferguson did not assert any additional assignments of error with respect to the remaining steps of the sequential evaluation process, and the court discerns none.

## Conclusion

The ALJ in this case was tasked with determining whether the claimant was disabled. In so doing, she considered the hearing testimony, the medical records, and expert opinion evidence. The evidence was not necessarily uniform, and, according to Ferguson, should have

compelled a different result. However, conflicts in the evidence are for the Commissioner to resolve. *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990) (citation omitted); *Grant v. Richardson*, 445 F.2d 656 (5th Cir. 1971) (citation omitted). This court may not "reweigh the evidence in the record, try the issues de novo, or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision." *Newton, supra* (emphasis added). That is not to say that the Commissioner's decision necessarily is blemish free, but procedural perfection in the administrative process is not required, and any errors do not undermine confidence in the decision. *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir.1988).[8]

For the foregoing reasons, the undersigned finds that the Commissioner's determination that the claimant is not disabled under the Social Security Act, is supported by substantial evidence and remains free of legal error. Accordingly,

IT IS RECOMMENDED that the Commissioner's decision be AFFIRMED, in its entirety, and that this civil action be DISMISSED with prejudice.

Under the provisions of 28 U.S.C. '636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party=s objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before a final ruling issues.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED**

---

[8] Procedural improprieties "constitute a basis for remand only if such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision." *Morris v. Bowen,* 864 F.2d 333, 334 (5th Cir. 2007).

**FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, on this 31st day of January, 2023.

KAYLA DYE MCCLUSKY
UNITED STATES MAGISTRATE JUDGE